**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| TIMOTHY HAYNES, | Case No. 8:23-cv-01177 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| TRANS UNION LLC, | |
| Defendant. | |

## COMPLAINT

Timothy Haynes ("Plaintiff" or "Mr. Haynes") a living, breathing 32-year-old consumer, brings this action on an individual basis, against Trans Union, LLC ("Defendant" or "Trans Union") and states as follows:

## INTRODUCTION

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and

efficiency.

2.    However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Trans Union acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

*Haynes v. Trans Union LLC*
Complaint

6.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See §1681(a)(1).

7.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 cong. Rec. 36570 (1970)) (emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information,

before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* §1681(a)(4).

10.      The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.      Plaintiff's claims arise out of Trans Union's blatantly inaccurate credit reporting, wherein Trans Union reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score.

12.      Accordingly, Plaintiff brings claims against Trans Union for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's

credit reports, in violation of the FCRA, §1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiff's credit file, in violation of the FCRA, §1681i.

13.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, §1681, *et seq*., as described herein.

## PARTIES

14.    Timothy Haynes ("Plaintiff" or "Mr. Haynes") is a natural person residing in St. Petersburg, Florida, and is a "consumer" as that term is defined in §1681a(c).

15.    Trans Union, LLC ("Defendant" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of Florida, including within this District.

16.    Trans Union can be served through its registered agent Illinois Corporation Service Company, located at 801 Adlai Stevenson Drive, Springfield, IL 62703.

17.    Trans Union is a "consumer reporting agency" as defined in §1681a(f).

Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in §1681a(d) to third parties.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1331 and 15 U.S.C. §1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

19.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

20.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

21.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their

grave responsibilities with fairness" in the very first provision of the FCRA. *See* §1681(a).

22.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* §1681(b).

23.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (§1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (§1681i).

24.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Trans Union's Practices Concerning the Sale of Reports on the "Deceased"**

25.    Trans Union sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

26.    Pursuant to §1681e(b), consumer reporting agencies, like Trans Union,

are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.    Pursuant to Sections 1681b and 1681e(a), consumer reporting agencies, like Trans Union, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

28.    Trans Union routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

29.    Trans Union's furnishers identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

30.    Trans Union does not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

31.    Upon information and belief, even if a furnisher provides Trans Union with a death certificate, Trans Union's systems would simply ignore it and only consider the coding under Metro 2.

32.    Trans Union does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact

*Haynes v. Trans Union LLC*
Complaint

deceased before placing a "deceased" mark on that consumer's report.

33.    Trans Union does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

34.    In some cases, in order to assure accuracy, Trans Union may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado.

35.    Trans Union does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

36.    Trans Union regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased.

37.    But Trans Union do not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about

said consumer, or at any time.

38.    Trans Union will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

39.    Therefore, Trans Union is well aware that it sells consumer reports that are objectively misleading.

40.    Trans Union fails to employ reasonable procedures that assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

41.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Trans Union does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

42.    Therefore, Trans Union is well aware that it sells consumer reports that are internally inconsistent and thus are patently and technically inaccurate.

43.    Even in instances where the purportedly deceased consumer communicates directly with Trans Union, Trans Union does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

44.    Once a "deceased" mark is placed upon a consumer's report, Trans Union will not calculate and will not provide a credit score for that consumer.

45.    Upon Trans Union's reports with a "deceased" mark sold to third parties, Trans Union never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

46.    Therefore, Trans Union is well aware that it sells consumer reports that are objectively misleading.

47.    Trans Union knows that third party credit issuers require a credit score in order to process a given credit application.

48.    Trans Union knows that consumers without credit scores are unable to secure any credit from most credit issuers.

49.    Trans Union knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

50.    Trans Union has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Trans Union is inaccurately reporting them as "deceased" and without a credit score.

51.    Trans Union has received and documented many disputes from consumers complaining that Trans Union had erroneously marked them as

*Haynes v. Trans Union LLC*
Complaint

"deceased" on their credit reports.

52.    Trans Union knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code, even when said consumers are not on the Death Master File and are in fact alive.

53.    Nevertheless, Trans Union does not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is in fact deceased.

54.    Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance decides to change the code.

55.    Trans Union does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

56.    Nor does Trans Union employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

57.    For years after a consumer's actual death, Trans Union will continue to sell credit reports about that consumer.

58.    Trans Union will only remove a deceased consumer's file from its respective credit reporting databases when the file is no longer valuable to it — meaning that no one continues to purchase reports about that consumer.

59.    Trans Union charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

60.    Trans Union profits from the sale of reports on deceased consumers.

61.    Trans Union has in its respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

62.    Trans Union knows that truly deceased consumers do not apply for credit.

63.    Trans Union knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Trans Union to be a common and major source of identity theft.

64.    Trans Union knows that identity theft and credit fraud are serious and widespread problems in our society.

65.    Trans Union warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the

deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

66.    Trans Union has no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

67.    Trans Union sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

68.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Trans Union to sell their credit reports, absent a court order.

69.    Trans Union knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Applies for Personal Loan Through NelNet and Is Denied**

70.    In or about January 2023, Plaintiff was interested in obtaining a loan in

14/25

*Haynes v. Trans Union LLC*
Complaint

order to help facilitate payment of his bills and simultaneously build his credit.

71.    On or about January 21, 2023 applied for a personal loan through NelNet.

72.    On or about January 21, 2023 NelNet summarily denied Plaintiff's application for credit.

73.    The same day, Plaintiff reviewed his CreditWise notifications on the phone application made available to him by Capital One. Those notifications stated that Trans Union was reporting him as "deceased".

74.    On or about January 27, 2023, Plaintiff's received a denial communicaiton from NelNet that stated NelNet had reviewed Plaintiff's Trans Union credit report.

75.    The denial letter also indicated that while LexisNexis credit score was available, Plaintiff's Trans Union credit score was not listed.

76.    Upon information and belief, Trans Union credit score was unavailable because of the deceased notation on Plaintiff's credit report.

77.    Trans Union violated §1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

78.    Upon information and belief, non-parties Equifax and Experian maintained and followed procedures that prevented them from accepting patently

inaccurate from the relevant furnisher and blocked the deceased notation from appearing on Plaintiff's credit report.

79.    Upon information and belief, Trans Union included the deceased notation on Plaintiff's consumer report even though the information provided by the relevant furnisher conflicted with the rest of the information Trans Union kept on Plaintiff's file, with the very fact that a Trans Union representative had spoken on the phone with Plaintiff, and with Plaintiff not appearing on the Death Master File.

80.    Upon information and belief, the three major consumer reporting agencies (Experian, Trans Union, and Equifax) share consumer information with each other.

81.    Trans Union knew or should have known it incorrectly reported Plaintiff as deceased when Equifax and Experian did not.

82.    Trans Union knew or should have known it incorrectly reported Plaintiff as deceased when other furnishers continued to report updates for Plaintiff's other accounts.

**Plaintiff's Disputes Inaccurate Credit Reporting**

83.    On or about January 21, 2023, extremely shocked, surprised, and embarrassed at Trans Union's inaccurate reporting, Plaintiff called Defendant and disputed the deceased notation that was reported on his credit report.

84.    Plaintiff explained that any notation that he was deceased on his credit

files was inaccurate as he was very much alive, evidenced him making that phone call, among other things.

85.    Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

86.    Upon information and belief, Trans Union never responded or otherwise communicated with Plaintiff following the dispute he made on January 21, 2023, as required under §1681i(a)(1), (6).

87.    Upon information and belief, Trans Union never forwarded or otherwise communicated with the relevant furnisher following Plaintiff's dispute on January 21, 2023, as required under §1681i(a)(2).

88.    Plaintiff again disputed the deceased notation by letter and requested that Trans Union send him a copy of his credit report.

89.    Plaintiff's letter included enough personal information for Trans Union to verify his identity, including his date of birth, current address, and last four of his social security number.

90.    Plaintiff's letter also included a copy of his driver license and social security card.

91.    Trans Union received Plaintiff's letter on April 5, 2023.

92.    Upon information and belief, Trans Union never responded or otherwise communicated with Plaintiff following the dispute he mailed on March

28, 2023, as required under §1681i(a)(1), (6).

93.     Upon information and belief, Trans Union forwarded Plaintiff's dispute letter to the relevant furnisher, as required under §1681i(a)(2).

94.     Upon information and belief, the relevant furnisher inaccurately verified the "deceased" notation on one or more accounts on Plaintiff's Trans Union credit report.

95.     Thereafter, Defendant failed to take any of the actions it was required to under §1681i(a)(5), such as correct or delete the deceased notation appearing in Plaintiff's credit file.

96.     Instead, Trans Union simply parroted the furnisher's "investigation results", even when the furnisher's response contradicted Trans Union's own records and Plaintiff's disputes.

97.     Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's disputes, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of §1681i(a)(1)(A).

98.     Plaintiff reasonably believes that Trans Union continued to publish that he was deceased in the credit reports it issued about him.

99.     As a result of the "deceased" notation, Trans Union made it effectively impossible for Plaintiff to obtain credit.

*Haynes v. Trans Union LLC*
Complaint

100.   At all times pertinent hereto, Trans Union was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

101.   At all times pertinent hereto, the conduct of Trans Union, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

102.   Numerous court decisions have admonished Defendant's practice of merely parroting the response of the credit furnishers following a dispute from a consumer, even when Defendant could reinvestigate the furnisher's response based on information publicly available and other information Defendant had on Plaintiff's file. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by §1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed);

*Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

103.  Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Defendant's violations of the FCRA are willful.

104.  Trans Union is aware of the shortcomings of its procedures and intentionally choose not to comply with the FCRA to lower its costs. Accordingly, Trans Union's violations of the FCRA are willful.

105.  As a result of Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

## COUNT I

## 15 U.S.C. §1681e(b)

## Failure to Follow Reasonable Procedures to Assure Maximum Possible

### Accuracy

106.    Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 to 105 as if fully stated herein.

107.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

§1681e(b) (emphasis added).

108.    On at least one occasion, Trans Union prepared patently false consumer report concerning Plaintiff.

109.    Despite actual and implied knowledge that Plaintiff is not dead, Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

110.    Trans Union violated §1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

111.    As a result of Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his

good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

112.   Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. Alternatively, they were negligent, entitling Plaintiff to recover under §1681*o*.

113.   Plaintiff is entitled to recover attorneys' fees and costs from Trans Union in an amount to be determined by the Court pursuant to §§1681n, §1681*o*.

## COUNT II

### 15 U.S.C. §1681i

### Failure to Perform a Reasonable Reinvestigation

114.   Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 to 105 as if fully stated herein.

115.   The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* §1681i(a)(1). The Act imposes a 30-day time limit for the completion of such an

investigation. *Id*.

116.   The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* §1681i(a)(5)(A).

117.   On at least two occasions during 2023, Plaintiff disputed the inaccurate information with Trans Union and requested to correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to his, namely, inaccurate reporting that he is "deceased" and has no credit score.

118.   In response to Plaintiff's disputes, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

119.   Trans Union violated §1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

120.   As a result of Trans Union's conduct, action, and inaction, Plaintiff

suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to he's credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

121.   Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. Alternatively, they were negligent, entitling Plaintiff to recover under §1681*o*.

122.   Plaintiff is entitled to recover attorneys' fees and costs from Trans Union in an amount to be determined by the Court pursuant to §§1681n, 1681*o*.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendants negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate

*Haynes v. Trans Union LLC*
Complaint

and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 26th day of May 2023,

CONSUMER ATTORNEYS

/*s/ Santiago J Teran*
Santiago J Teran (FL Bar No. 1018985)
E-mail: steran@consumerattorneys.com
Consumer Attorneys
2125 Biscayne Bldv., Ste 206
Miami, FL 33137
Direct: (347) 946-7990
Facsimile: (718) 715-1750

Consumer Attorneys
8245 N. 85th Way
Scottsdale, AZ 85258

*Attorney for Plaintiff*
*Timothy Haynes*